156 N.J. Super. 145 (1978)
383 A.2d 718
HERMAN C. SILVERSTEIN, PLAINTIFF-APPELLANT,
v.
AARON LAST AND AMBER CORPORATION, A CORPORATION OF NEW JERSEY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued December 12, 1977.
Decided February 7, 1978.
*148 Before Judges CONFORD, MICHELS and PRESSLER.
Mr. Joel N. Kreizman argued the cause for appellant (Messrs. Evans, Koelzer, Marriott & Osborne and Messrs. Clapp & Eisenberg, co-attorneys).
Mr. Francis X. Kennelly argued the cause for respondents (Messrs. Schumann, Hession, Kennelly & Dorment, attorneys; Mr. Kenneth J. Quinn on the brief).
The opinion of the court was delivered by PRESSLER, J.A.D.
Plaintiff Herman C. Silverstein brought this accounting action complaining of various breaches of the fiduciary duty owed him by his joint adventurer, defendant Aaron Last, with whom he owned as tenant in common five apartment houses in Jersey City, all of which were managed by defendant Amber Corporation (Amber), a corporation wholly owned and operated by Last. The trial court, after a fifteen-day trial, disallowed all of plaintiff's claims. We are constrained to reverse.
*149 The historical and relational facts as opposed to the financial facts may be briefly stated. Silverstein and Last, both attorneys-at-law of this State, had been close friends from boyhood, their relationship enduring until early 1971 when Silverstein believed that he had good reason to suspect Last's probity in respect of the manner in which Amber had managed their joint property interests for the 35 years last past. Up until that point Silverstein, an experienced real estate lawyer, had left the management of the properties to Last, who was the real estate management expert of the two, pursuant to an oral agreement whereby Last, through Amber, was to charge a management fee, which rose through the years from three to five per cent of gross rents received. It was their practice for Amber to provide Silverstein with an annual year-end financial report consisting of a one-page statement of assets and liabilities and a one-page statement of income and expenses, broken down as to each property. The expense statement was abbreviated and categorical, simply noting the total amounts for each of the customary categories, such as maintenance and repairs, taxes, insurance, the various utilities, janitorial services, mortgage costs, depreciation and management. Silverstein, who reposed special trust and confidence in Last not only because of Last's expertise but also because of their personal relationship, generally accepted these statements without question and certainly without himself or others on his behalf auditing the Amber books or otherwise corroborating their accuracy and correctness. Early in the joint venture relationship, which began in 1946, Silverstein's accountants had apparently from time to time reviewed Amber's books, but that practice had been long since discontinued. Silverstein's active participation in the affairs of the joint venture was to provide legal services required in the acquisition and sale of the properties themselves and in their financing and refinancing. It is clear that neither his legal services nor his direct participation extended to matters of day-to-day management.
*150 As the personal relationship between Silverstein and Last began to disintegrate in 1971, so did their business relationship and after various unsuccessful attempts to compromise their differences and to disengage amicably, their affairs reached a point of hopeless impasse and this action was accordingly commenced. Silverstein originally sought not only a full accounting of the rents, issues and profits of the five properties, two of which had been sold prior to the rupture, but also an operating receiver of the three properties they continued to hold. He also demanded punitive damages. Last counterclaimed, seeking reimbursement for a variety of alleged property expenses incurred by Amber over the years which Amber allegedly had inadvertently neglected to charge against Silverstein's account.[1] Prior to trial the parties agreed to retain a named managing agent for the properties at a management fee of four percent of gross rentals, rendering the receivership application moot. Also on pretrial application, an order was entered on May 3, 1974 directing Last and Amber to accord plaintiff's accountant full access to the books and records relative to the five properties. Partition sale of the three properties still owned by them was also directed, but not to take place until "after this Court had determined the amount, if any, due plaintiff by defendants in connection with the said five properties and the mortgages thereon." Extensive auditing of Amber's records by plaintiff's representatives ensued, a process made inordinately burdensome and time-consuming, so plaintiff alleges, as a result of the refusal of Last and his representatives to reasonably cooperate. In any event, trial commenced in November 1975 before final completion of plaintiff's ongoing audit.
*151 Despite the magnitude and number of the specific charges made by both Silverstein and Last against each other, we must observe at the outset that these ventures were generally quite profitable to both participants, that Silverstein received regular periodic distribution, and that there is neither allegation nor proof of gross defalcation on Last's part. Rather, the picture which ultimately developed at trial was, if anything, one of relatively minor overreaching by Last. We do not make that observation to deprecate any degree of overreaching by a fiduciary but rather to clarify the proportion and dimension of the controversy. The asserted wrongdoing was alleged to be wrong, not because the conduct was necessarily commercially unreasonable or resulted in gross mismanagement of the properties or in substantial prejudice to plaintiff's financial interests but rather because it failed to comport with the standard of conduct imposed by law on a fiduciary, who is not merely prohibited from making an inordinate profit from his fiduciary position but from making any undisclosed profit at all therefrom. It is essentially Last's alleged undisclosed profiting at the expense of the joint venture for which this action seeks vindication and damages.
Out of the great number of specific claims of violation of fiduciary duty raised by plaintiff at trial, some ten categories of improper charging by defendants to the account of the joint venture are being pursued on this appeal. Since for the reasons hereafter stated we are satisfied that the trial court's "no-cause" conclusion must be reversed and that there must be a retrial as to these ten categories as well as the issue of punitive damages, we will deal with each of them hereafter with specificity. Suffice it to say at this point that plaintiff at least prima facie did prove some degree of overreaching by defendants and that the trial judge's denial of relief to plaintiff despite these proofs proceeded from a misconception of the nature of the joint adventurer relationship which was so fundamental as to *152 infect all its subsequent findings and to render them, in the appellate context, unreliable and unsustainable.
The basic error of the trial judge lay in his apparent failure to appreciate that while the Last-Silverstein relationship was, as a matter of technical classification, indeed a joint adventure or a series of joint adventures rather than a partnership, nevertheless, in terms of the fiduciary obligations owed by one participant to another and particularly by the managing participant to the other, the classification is immaterial. A joint adventurer owes no less a fiduciary duty to his co-adventurer than does one partner to the other. As expressed in Bowne v. Windsor, 106 N.J. Eq. 415, 416 (Ch. 1930), aff'd o.b. 108 N.J. Eq. 274 (E. & A. 1931), "The relation of joint adventurers, like that of copartners, is fiduciary, one of trust and confidence, calling for the utmost good faith, permitting of no secret advantages or benefits." That principle of law continues with undiminished vitality. See, e.g., Wiley v. Wirbelauer, 116 N.J. Eq. 391, 392 (Ch. 1934); Cooperstein v. Shapiro, 118 N.J. Eq. 337, 340 (E. & A. 1935); Stein v. George B. Spearin, Inc., 120 N.J. Eq. 169 (Ch. 1936); Plant-Erickson v. Ditter, 131 N.J. Eq. 163, 165 (Ch. 1942); Wittner v. Metzger, 72 N.J. Super. 438, 444 (App. Div. 1962), certif. den. 37 N.J. 228 (1962); Grober v. Kahn, 47 N.J. 135, 149 (1966); 68th St. Apts., Inc. v. Lauricella, 142 N.J. Super. 546, 559, fn.2 (Law Div. 1976), aff'd 150 N.J. Super. 47 (1977). See Stark v. Reingold, 18 N.J. 251, 261 (1955). It is also a necessary corollary of this rule that the managing joint adventurer, like the managing copartner, has concomitantly the strictest possible obligation to a coadventurer since the mutual affairs are delegated to his supervision and control without expectation or anticipation by either of routine interference or monitoring on the part of the nonmanaging venturer.
It is evident that the trial judge did not purport to assess Last's conduct by the required fiduciary standard. In appraising plaintiff's proofs the judge concluded, virtually *153 unsupported by findings of fact as to specific claims of Last's personal profiteering, as follows:
I am satisfied from all of the evidence before me and so find that Last and Amber did not use or misuse funds from the corporate general account for the personal benefit of Last. Furthermore, there is no convincing evidence of mismanagement or waste on the part of defendants.
Reference to Amber's general corporate account is not responsive to the claim of excess billing to the joint venture, and the concept of waste and mismanagement is not responsive to the question of whether or not the fiduciary obligation was fulfilled. We cannot accept the general conclusion we have quoted as an appropriate adjudicatory disposition of this controversy because we are satisfied that it proceeded from application of a commercial rather than a fiduciary standard of conduct.
We are also unable, because of the necessary consequences of the fiduciary relationship which actually existed, to accept the judge's conclusion that Silverstein's claims were barred by reason of laches and estoppel. The basis of the judge's application of the estoppel defense was his finding that Silverstein had actually acquiesced in the managerial and fiscal practices of which he now complains. Acquiescence was found in such facts as Silverstein's expertise as a real estate lawyer, his receipt of the annual statements and his access, had he chosen to avail himself of it, to Amber's books and records. We are constrained to conclude that acquiescence cannot be based on any of these considerations, either individually or in combination. As we have said, Silverstein's expertise in title matters did not render him an expert in management matters, and even if it did, it would not have in any way precluded his decision to leave the management to Last, who did have particular expertise, who was an attorney and who was also his best friend. Also, as we have suggested, the annual statements afford no basis for acquiescence in anything not appearing thereon, *154 and but for one exception we will address hereafter, none of the claims here made relates to matters discernible from the statements themselves. Moreover, the extent of the alleged overreaching was not of such a magnitude as to have infected the prima facia integrity of the statements even to one conversant in real estate matters. The whole point here is the allegation that the figures appeared to be within the normal range of expense experience despite the fact that they concealed excessive charges. Nor does Silverstein's presumed access to actual full and complete records point to acquiescence. Both the appearance and the assurance that all was in order constituted adequate justification for Silverstein not to have regularly checked on Last's management activities. Again, the basic point here is that when coadventurers agree that one will manage their joint affairs, they both understand that the nonmanaging adventurer will rely on the managing adventurer to do so in accordance with his obligations, and the nonmanaging partner is under no duty, unless there are suggestive circumstances or other notice to him of impropriety, to superintend that management or to oversee it or indeed to audit it.
With respect to laches, it was not defendants' argument that the claim in its totality was barred by reason of the mere lapse of time before Silverstein sued, but rather that because of the lapse of time they should not be chargeable with the obligation to account for those years past for which the books and records necessary to construct an accounting were in the normal course not retained. Plaintiff does not argue with this proposition in which we, as well, concur. The relief directed herein will accordingly be limited to those years for which the books and records are still available.
Having concluded that Silverstein has at least a viable claim against Last under these principles, we consider the claims seriatim. We preface this consideration with the observation that it was Silverstein's undisputed testimony that no expenses would be charged to the joint venture *155 other than those actually incurred and that the management fee would cover all of the services rendered by Last through Amber over and above out-of-pocket expenses. There being no essential dispute as to that proposition, we find that to have been the arrangement as a matter of fact. R. 2:10-5. There is, however, dispute as to whether or not Silverstein had been advised that certain management services would be separately charged. More as to that hereafter.
[The court here discussed nine categories of alleged excessive charges.]
Insurance Commissions. Last, who held a corporate insurance broker's license, procured all of the required insurance for the joint venture and received commissions thereon. It is Silverstein's claim that he was totally unaware that Last was receiving such commissions. Last does not contend that he expressly so advised Silverstein but rather that it was his assumption that Silverstein must have assumed that he, Last, was receiving such commissions. The trial judge imputed such knowledge to Silverstein, relying on the fact that Silverstein had engaged Last's services to procure insurance policies for himself and members of his family with respect to risks having nothing at all to do with the joint venture and that he knew that as to these policies Last was charging a commission. We do not find this imputation persuasive in view of Silverstein's assertion that while he fully expected Last to earn a commission on such unrelated insurance, he did not expect Last to earn a commission at the expense of the joint venture. Last's response is that whether or not Silverstein knew of the commission, he was nevertheless obliged to charge it by virtue of N.J.S.A. 17:29A-15, which prohibits an insurance broker from rebating, discounting or otherwise reducing the premium.
As we have said, a fiduciary responsible for the administration of a trust is prohibited from receiving any undisclosed profit from that administration other than compensation for the fiduciary services themselves. Accordingly, it is well settled that that prohibition extends to the receipt *156 of any undisclosed commissions or bonuses. See Rothenberg v. Franklin Washington Trust Co., 133 N.J. Eq. 261 (E. & A. 1943). If, of course, Silverstein actually knew of the commission and concurred therein, there would be no wrongdoing. If, on the other hand, it should be found as a matter of fact on retrial that he did not know of the commission, we do not regard the cited statute as an absolute bar to such relief as plaintiff would otherwise be entitled to. We are satisfied that the essentially remedial purpose of N.J.S.A. 17:29A-15 need not be regarded as conflicting with the common-law principle barring undisclosed fiduciary's commissions. At the very least Last would have been required, absent disclosure and concurrence, to forego the commission by having another broker place the insurance. See generally, Bogert, Trust and Trustees (2 ed. 1960), § 543 (M) at 554-555; 2 Scott, The Law of Trusts (3 ed. 1967), § 170.22 at 1374-1377. We are satisfied that Last, if he did not disclose his receipt of insurance commissions to Silverstein, may not benefit therefrom and would, therefore, be required to reimburse Silverstein for a proportionate amount thereof. Such a surcharge imposed as a penalty for violation of a fiduciary obligation does not contravene or impinge upon the underlying purpose of N.J.S.A. 17:29A-15, which is to ensure strict adherence to established insurance rates. See Coro Brokerage, Inc. v. Rickard, 29 N.J. 295, 298-301 (1959). We do not believe that the prohibition of the statute was in any way intended to undermine the high standard of fiduciary conduct otherwise imposed by the law.
We note that plaintiff's insurance expert testified that commissions are in fact waivable by a broker and that the present managing agent for the joint venture properties testified that he was receiving, for having placed some of the insurance, a "partial commission," although the basis for not receiving a full commission was not fully explained. It may be that part of what appears as commission is not part of the actual premium but an additional charge for *157 broker's services billed to his client. See Coro Brokerage, Inc. v. Rickard, supra at 301. It was in any event clear that the present managing agent was able to effect substantial insurance savings by "negotiating" the premium. Plaintiff's proofs further indicated other alternatives for minimizing insurance costs, such as placement with mutual companies. We do not, however, pass upon these questions in view of what we have heretofore said regarding Last's obligation to have had another broker place the insurance absent disclosure to Silverstein.
In addition to the foregoing categories of complaints Silverstein makes four additional charges of breach of fiduciary obligation by Last. First is Last's undisputed intention to charge a real estate broker commission on a proposed sale of one of the joint venture properties. That sale in fact never took place and, therefore, neither did any actual wrongdoing. Last's intended wrongdoing may, however, as pointed out hereafter, bear on the question of punitive damages. Silverstein also complains of Amber's having maintained all through the years a commingled account, not only for all of the joint venture properties but also including the funds of the Last family properties which it managed. As to this the trial court found, and we concur, that Silverstein had full knowledge of this fact and that it resulted in no financial prejudice to him. The third charge, which will require further fact-finding by the trial judge, involves the disposition of a mortgage which came due for payment on one of the joint venture properties after the personal relationship had disintegrated. It was Silverstein's testimony that being unwilling to engage in any further affairs with Last, it was his desire to pay off his share of the mortgage in full. He was requested by the mortgagee bank, whose interest charge for refinancing the mortgage was regarded by Silverstein as excessive, to take an assignment thereof. This he did not do, and without further notice to him, the bank assigned the mortgage to Last, who charged first 7 1/2% interest thereon and then "when Mr. Silverstein started sending *158 his accountants in to see me," 8 1/2%. It is clear to us that any communicated intention by Silverstein to pay off his share of the mortgage would preclude any continuing interest charges thereon by Last, and further, that Last's acceptance of the assignment should have been on notice to Silverstein. The retaliatory raising of the interest rate is, of course, unsustainable. We, therefore, direct the trial judge to make specific findings of fact with respect to these events and to enter an appropriate order for reimbursement depending on when Last first knew of Silverstein's willingness and ability to pay his share of the mortgage and, if he did not, to determine under the circumstances what the appropriate interest on the mortgage was which should have been charged by Last and to direct Last to account for any excess.
The last of Silverstein's claims relates to a withholding by Last of distributions of profit after the disintegration of their relationship. That withholding was the subject of a pretrial application by Silverstein resulting in the then Chancery Judge (now Justice Schreiber) directing Last to make immediate payment of the withheld sums. Silverstein now claims interest on the sums withheld from the time of their improper withholding until the time they were paid. In our view he is clearly entitled to this relief.
The foregoing directions are intended to define, insofar as presently feasible based on the record to date, the general parameters of what is in the nature of compensatory damages. The trial judge, having found that plaintiff was not entitled to compensatory damages, denied punitive damages as well. On the remand, the trial judge will be required to reconsider the punitive damages question in light of the merits of plaintiff's cause of action and in consonance with the general principles governing such an award. See Leimgruber v. Claridge Associates, Ltd., 73 N.J. 450 (1977). We point out, however, that in so doing and in evaluating the egregiousness of defendants' conduct, the judge may consider defendant's retaliatory motivations from *159 and after 1971 and those improper actions which did not result in financial harm to plaintiff, such as the projected hidden real estate brokerage commission we have heretofore referred to.
A final word as to procedure. During the course of trial counsel for the parties entered into various stipulations with respect to the calculation of at least some of the items we have heretofore referred to. In order that trial and ultimate disposition can be expedited, we direct the trial judge to hold a supplementary pretrial for the purpose of determining those matters which may be stipulated, those matters which require further discovery and those matters which require additional proofs. We do not retain jurisdiction.
Reversed and remanded for further proceedings consistent with this opinion.
NOTES
[1] An amendment to the counterclaim sounding in slander was severed, survives, and is not now before us. The remainder of the counterclaim was dismissed out of hand as having been purely retaliatory. Last did not appeal from that determination.