In re Lonnie SOMERVILLE, Debtor.

Luther RANDOLPH, Plaintiff,

v.

Lonnie SOMERVILLE, Defendant.

Bankruptcy No. 83–04881K.
Adv. No. 85–0904K.

United States Bankruptcy Court,
E.D. Pennsylvania.

May 19, 1987.

David R. Dearden, Philadelphia, Pa., for debtor.

James Wade, Philadelphia, Pa., trustee.

James G. Buckler, Brookhaven, Pa., for plaintiff.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

Presently before the Court is an adversary proceeding in which the Plaintiff, Luther Randolph (hereinafter referred to as "Randolph"), objects to the discharge of the Debtor, Lonnie Somerville (hereinafter referred to as the "Debtor"), pursuant to 11 U.S.C. §§ 727(a)(2), (a)(3), and (a)(5). In the same Complaint, Randolph also seeks a determination of the dischargeability of his debt pursuant to 11 U.S.C. § 523(a)(2)(A). We find that the Plaintiff has established that the Debtor should be denied a discharge pursuant to §§ 727(a)(3) and (a)(4), principally due to our determination that the Debtor has not been truthful either in this filings in this Court or in his testimony at trial, and we believe that honesty in proceedings in this court is the linchpin of § 727(a). We reach this conclusion even though Randolph presented a relatively poor case, and, despite our finding on the critical issue of credibility, we are unable to act in Randolph's favor on the basis of the record made as to §§ 727(a)(2) and (a)(5). In light of our conclusion that the Debtor's entire discharge must be denied, we believe that it is not necessary to determine the non-dischargeability of Randolph's debt under § 523(a)(2)(A) or to make Findings of Fact relative to that matter, although we would be unlikely to have reached this conclusion on the basis of the Plaintiff's sole theory, *i.e.*, collateral estoppel from the state court proceedings.

Pursuant to our Order of January 29, 1987, establishing a schedule that briefs be filed after preparation of the Transcript of the trial of January 28, 1987, had been completed, the parties filed briefs, Randolph on March 2, 1987, and the Debtor on March 20, 1987. Per Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52(a), we present our Opinion in the form of Findings of Fact, Conclusions of Law, and a Discussion.

■ We note at the outset one procedural issue not addressed until our accompanying Order. On October 1, 1985, this Court entered a "conditional discharge" Order, per its practice at that time, on the date of the meeting held pursuant to 11 U.S.C. § 341. Since this adversarial proceeding was instituted in timely fashion on October 10, 1985, see Bankruptcy Rules 4004(a) and 4007(b), and we grant Randolph relief, that Order must be vacated.

### B. FINDINGS OF FACT

1. The Debtor, LONNIE SOMERVILLE, filed a Chapter 13 Petition on De-

cember 16, 1983. On March 1, 1984, the Debtor filed a Chapter 13 Statement, Plan, summary Sheet, List of Creditors, and Bankruptcy Rule 2016(b) Statement.

2. On February 13, 1985, the Debtor filed an Application to convert his case to a Chapter 7 case, which was granted, and an Order was so entered on February 14, 1985.

3. On July 15, 1985, the Debtor filed the Chapter 7 Statement of Affairs, Schedules, Master Sheet, and Statement Pursuant to Rule 2016(b).

4. At the hearing of January 28, 1987, the Debtor verified and confirmed his signatures on the Chapter 13 documents which were filed on March 1, 1984.

5. However, the Debtor refused to verify the signatures on the Chapter 7 documents, filed on July 15, 1985, testifying that he had not reviewed these documents, but had merely authorized his then-attorney, James W. Wilson, Esquire, to sign same on his behalf.

6. The Debtor also testified that he had not filed any amendments to his Statement or Schedules, nor indicated any intention to do so in the future.

7. Both Randolph and the Debtor have been employed as full-time school teachers by the Philadelphia School District for more than ten years. The parties have known each other since childhood, and professionally as well since they taught at the same school in 1979.

8. The Debtor and Randolph entered into a business relationship or partnership for the training, breeding, and racing of horses in January, 1980, which relationship was memorialized in a written contract.

9. Immediately prior to the formation of the partnership, the Debtor owned three horses, Pam–N–Heather (a "chestnut filly"), Jennifer (also known as "Donna's Lace"), and Pearly. Upon the formation of the partnership, Randolph purchased fifty (50%) percent of the interest in two of these horses, Pam–N–Heather and Pearly; and both horses became the assets of the partnership pursuant to the agreement of the parties.

10. Jennifer remained solely owned by the Debtor. The Debtor also subsequently leased a part-interest in a horse named Silent Rebellion during the time that the partnership existed.

11. The partnership later acquired a third horse, an unnamed colt.

12. Randolph entered into the partnership based upon the Debtor's representations that he was a trainer and had been breeding and racing horses for some time. Prior to entering this partnership, Randolph had no experience with this business.

13. The responsibilities of the partnership were divided such that Randolph was to be in charge of the administrative or bookkeeping duties, and the Debtor was to be in charge of the care, training, and racing of the horses.

14. Expenses of the business were to be shared equally. The contemplated procedure established was that the Debtor would inform Randolph of his need for certain items, such as feed or hay for the horses. A voucher or petty cash slip (hereinafter referred to as "the vouchers") was then to be filled out by the Debtor to confirm that Randolph was giving fifty (50%) percent of the stated amount to the Debtor for the purchase of these needed items.

15. Although Randolph was in charge of the books and requested receipts from the Debtor, he never received any receipts from the Debtor to verify that purchases were made pursuant to the vouchers.

16. Randolph did keep ledgers or records of expenditures which were based upon the vouchers. Over time, Randolph came to believe that the Debtor had misappropriated funds, particularly because he could not obtain receipts for purchases from the Debtor.

17. As a result of continuous friction concerning the accounting, or lack thereof, for expenditures, the partnership ceased to operate in November, 1981.

18. The Debtor attempted to place responsibility for insufficiency of bookkeeping upon Randolph. However, the Debtor never refuted his failure to provide

Randolph with receipts. We do not accept the Debtor's claims that Randolph was primarily responsible for these problems, but rather we believe that the Debtor was primarily so responsible, due to his failure to produce the receipts.

19. On June 23, 1982, Randolph filed suit against the Debtor in the Court of Common Pleas of Delaware County, Pennsylvania, both in assumpsit, requesting compensatory damages of $24,862.90 and a rescission of the partnership agreement, and in trespass, requesting both compensatory damages of $24,862.90 and punitive damages of $10,000.00.

20. A jury trial took place in this suit during October and November, 1983, which lasted ten days. The jury returned a verdict in favor of Randolph in the amount of $20,000.00 compensatory damages and $5,000.00 punitive damages.

21. In this same action, the Debtor filed a Counterclaim, on which the jury returned a verdict in favor of Randolph.

22. Randolph's action in assumpsit was based upon allegations of a breach of the contract or partnership agreement between the Debtor and Randolph.

23. Randolph's action in trespass was based upon allegations of misrepresentation or fraud by the Debtor which induced Randolph to enter into partnership with the Debtor.

24. Randolph was aware that the Debtor's regular and fulltime employment was as a teacher. Randolph was also aware that the Debtor had a home remodeling business, as well as his own separate horse racing, breeding, and training business.

25. The Debtor trained, raised, and raced horses between 1963 and 1983, and kept records concerning this business from 1963 until 1983.

26. The Debtor has been licensed by the respective State Racing Commissions in the States of Rhode Island, Massachusetts, West Virginia, Delaware, New Jersey, and Pennsylvania, maintaining his licenses in New Jersey and Pennsylvania until 1982. These licenses permitted him to conduct his horse racing business.

27. About six months before the inception of the partnership, Pearly won a race at the Atlantic City Race Course, earning $5,000.00; she had also previously finished second and fourth at Delaware Park. Pearly had been trained by the Debtor.

28. The Debtor was audited by the Internal Revenue Service in 1982 and claimed that he subsequently destroyed or threw away records through the date of his audit, allegedly believing that there was no need to keep records subsequent to the date of audit. We find this testimony to be of doubtful credibility.

29. Prior to filing for bankruptcy, the Debtor claimed that his records with respect to his .business were placed in the possession of his previous attorney, Mr. Wilson. We find that this attempt, like the attempt to foist off the inaccuracies in the Chapter 7 statements upon Mr. Wilson, who is a conscientious practitioner before us, of extremely doubtful veracity and likely to have been concocted for purposes of expediency rather than truthfulness.

30. Randolph did not file any income tax returns for the partnership because he had no receipts for expenditures other than the vouchers.

31. Randolph did file his own personal federal income tax returns for 1980 and 1981, in which he reported business expenses and deductions of $7,985.00 and $10,533.00, respectively, for the business of horse racing and breeding, and which was improperly reported as a sole proprietorship rather than a partnership.

32. The Debtor did not file any income tax returns for the partnership, claiming that this was Randolph's responsibility.

33. The Debtor did file his own personal federal income tax returns for 1980 and 1981, in which he reported business expenses of $10,618.00 and $12,922.20 respectively. However, the evidence was inconclusive as to whether these amounts were solely attributable to the business of horse racing and breeding or whether these amounts included losses from other businesses of the Debtor.

34. In filing his federal income tax returns, the Debtor requested refunds of $2,160.79 in 1983, $2,844.72 in 1982, and $4,442.81 in 1981.

35. In the Debtor's Chapter 13 Statement, filed in March, 1984, he responded in the negative to an inquiry as to whether he was possibly entitled to any tax refunds. This statement was a false oath.

36. The Debtor testified that he did not recall his testimony, given at the Meeting of Creditors pursuant to 11 U.S.C. § 341. Although the transcript of that meeting was not admitted into evidence to directly impeach the Debtor, the Debtor responded to questions from Randolph's attorney indicating that his testimony there was that he gave all of the horses away to friends by not denying that he had so testified or attempting to reconcile any inconsistencies, but merely by stating, with little expression or amplification, that he "did not recall" the testimony there.

37. The Debtor testified at trial that, in approximately November, 1983, within one week of the trial referred to in paragraph seventeen, *supra*, two horses, Pearly and Jennifer, were taken by an alleged creditor, "Mr. Long," on account of unpaid debts incurred for their upkeep.

38. The Debtor asserted that he owed money to "Mr. Long" for hay, feed, and straw for the horses but he could not recall the amount owed. The Debtor testified that he purchased these items from "Mr. Long" at his farm, but he claimed that he did not know the name of the town in which it was located except that it was "somewhere in Maryland." When asked more about "Mr. Long," the Debtor stated that he "heard he died."

39. The Debtor testified that the chestnut filly, Pam–N–Heather, died of colic at approximately the same time period in which Pearly and Jennifer were allegedly taken by Mr. Long.

40. At the time at which Pearly and Jennifer were allegedly taken by "Mr. Long," they were allegedly of no value to the Debtor. We seriously doubt the credibility of the Debtor's entire recitation concerning "Mr. Long," because he failed to mention "Mr. Long" at his § 341 meeting. It seems more likely to us that the Debtor sold these horses and concocted various stories concerning their disposition to conceal his realization of profits from their sale.

41. Randolph presented no evidence as to the value of any of these horses.

42. The Debtor also testified that the unnamed colt was given away in the same time period that Pearly and Jennifer were allegedly taken by "Mr. Long" and Pam–N–Heather died. The colt was allegedly given away because it had no name and because the Debtor was not in possession of the colt's papers and consequently, it could not be raced. The Debtor could not recall to whom the colt was given.

43. The Debtor gave no explanation for not naming the colt in order to race it, which would appear very easy to have accomplished. The Debtor also failed to give a reasonable explanation for purchasing this unnamed colt originally if it was not to be raced. All of these unlikely explanations cast further doubt on the credibility of the Debtor.

44. We also find the Debtor's testimony regarding the disposition of the unnamed colt, Pearly, Jennifer, and Pam–N–Heather (and the Debtor is silent about what happened to Silent Rebellion) to be incredible for the following reasons: The Debtor's lack of specificity and detail in his recollations is astounding; there is an absence of any kind of corroborative or supportive evidence produced by the Debtor; and on the basis of the Debtor's demeanor at trial, which did not inspire confidence in the truth of virtually any of his statements.

45. We find that the Debtor made several materially false statements in his sworn Chapter 13 Statement. The Debtor falsely stated that he had not operated a business in the past three years, that he was not entitled to any tax refunds, that no property had been returned or seized by anyone within ninety days of filing the petition, and that no transfers of any property had been made within the year preceding the filing of the petition. We refuse to

attribute all of these "errors," as the Debtor would have us do, to Mr. Wilson.

## CONCLUSIONS OF LAW

1. Pursuant to § 727(a)(2), an objector need not prove fraud; proof of an intent to hinder or delay creditors will suffice to deny discharge of a debtor.

2. Clear and convincing evidence is required to prove fraud; however, intent to hinder or delay creditors may be proven by a preponderance of the evidence.

3. Although the Debtor's testimony was in almost every respect unconvincing, Randolph failed to meet his heavy burden of proof as an objector to discharge under § 727(a)(2).

4. Similarly, Randolph failed to entirely convince us, by evidence sufficient to meet his heavy burden, that the Debtor failed to satisfactorily explain the loss of assets per § 727(a)(5).

5. Randolph did, however, sustain his burden of showing, by a preponderance of the evidence, that the Debtor had failed to keep or preserve records or to establish that same was justified under the circumstances. Accordingly, a discharge must be denied to the Debtor on the basis of § 727(a)(3).

6. Randolph also sustained his burden of proving that the Debtor made false oaths in connection with his Chapter 13 Petition, and that the false statements were material. Accordingly, a discharge must be denied to the Debtor pursuant to § 727(a)(4).

## DISCUSSION

Randolph objects to the discharge of the Debtor, pursuant to 11 U.S.C. §§ 727(a)(2), (a)(3), (a)(4)(A) and (a)(5), which provide in pertinent part as follows:

(a) The court shall grant the debtor a discharge, unless—...

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or ...

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;

...

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities; ...

It cannot be overemphasized that Section 727 is the heart of the Bankruptcy Code and that the "fresh start" that it engenders is one of the most powerful of the benefits of invocation of the Code to debtors. Hence, "a denial of discharge to a debtor is not a step to be taken lightly. Objections to discharge must be construed strictly against the objector and liberally in favor of the debtor." *In re Woerner*, 66 B.R. 964, 971 (Bankr.E.D.Pa.1986), *aff'd*, C.A. No. 86–7324 (E.D.Pa., Order filed April 28, 1987). *Accord: In re Decker*, 595 F.2d 185, 187 (3d Cir.1979); *In re Goldstein*, 66 B.R. 909, 917 (Bankr.W.D.Pa.1986); and *In re Gelfand*, 47 B.R. 876, 879 (Bankr.E.D. Pa.1985). "Public policy requires that objections to discharge not be easily granted." *Woerner, supra*, 66 B.R. at 971.

Randolph, therefore, has the burden of proving his objections to discharge, as Bankruptcy Rule 4005 specifically provides. Our Findings of Fact make clear that we have serious questions about almost everything that came out of the Debtor's mouth throughout his testimony. Ultimately, this, rather than the strength of Randolph's case, leads to our decision to deny

the Debtor's discharge. However, as stated earlier, the burden of proof falls upon Randolph, as the objector.

We shall first turn to an analysis of the burden of proof under § 727(a)(2). The evidence shows that a transfer of at least three horses occurred well within one year of the filing date, and that it was done or permitted to be done by the Debtor herein. Hence the only issue is whether Randolph established that this was done "with intent to hinder, delay, or defraud a creditor."

■■■ In light of the fact that the language of § 727(a)(2) is disjunctive, it is not necessary that the objector prove fraud; proof of an intent to hinder or delay will suffice. *In re Morris*, 51 B.R. 462, 464 (Bankr.E.D.Tenn.1985). The significance of the disjunctive becomes apparent when one considers that a higher standard of proof, clear and convincing evidence, is required to prove fraud, *see, Woerner, supra*, 66 B.R. 964, 972, as opposed to the fact that the preponderance of the evidence applies to proof of an intent to hinder or delay creditors. Moreover, "discharge will be denied under § 727(a)(2)(A) only if the debtor possessed the actual intent to hinder his creditors. The requisite intent will be presumed where the debtor gratuitously transfers valuable property, or transfers property for inadequate consideration, when pressed by creditors." *In re Bacher*, 47 B.R. 825, 828 (Bankr.E.D.Pa.1985) (citing 4 COLLIER ON BANKRUPTCY, ¶ 727.02 at 727–15 (15th ed. 1984)). *Accord: Morris, supra*, 51 B.R. 462.

■■■ The only evidence concerning this objection was the Debtor's testimony that two horses, Pearly and Jennifer,[1] were taken by a creditor, "Mr. Long," on account of unpaid debts for the upkeep of these horses; that a third horse, the unnamed colt, was given away; and that these events occurred the week following the trial in which a jury verdict was entered against the Debtor for $25,000.00 in compensatory and punitive damages. There was no evidence offered by Randolph as to the value of these horses at the time of the transfer,

which evidence would be necessary to prove an intent to hinder or delay creditors. In fact, there is only the uncontradicted, though dimly-valued, testimony of the Debtor that the horses were of no value, which we would charitably state may be supported by the Debtor's testimony. While the Court does not condone the omission of the transfer in the Debtor's Statement, his asserted belief that the horses were worthless when transferred would negate any intent to hinder, delay, or defraud creditors. *Morris, supra*, 51 B.R. at 466. Therefore, the objector must present some other evidence to carry his burden of proof. It appears as though Randolph fails to recognize that it is his burden to prove the elements of § 727(a)(2). Despite the fact that this Court does not find the Debtor's testimony to be credible, which makes Randolph's objection under § 727(a)(2) a close question, Randolph's proofs are nevertheless insufficient to sustain his heavy burden under § 727(a)(2). *See, Goldstein, supra*, 66 B.R. at 918. Even assuming that the transfer of the horses evidence an intent to prefer a creditor, such as "the late Mr. Long," this would not constitute a substitute for the requisite proof of an intent to hinder, delay or defraud creditors. 4 COLLIER, *supra*, ¶ 727.02 at 727–16. As COLLIER succinctly states:

In order to justify the refusal of discharge there must have been more than a preferential payment or preferential transfer. If, under section 727(a)(2), a transfer is relied on, it must be shown that there was an actual transfer of *valuable property* belonging to the debtor *which reduced the assets available to creditors and which was made with a fraudulent intent. Id.* at 727–20 to 727–22 (emphasis added) (citations omitted).

■■■ We turn to Randolph's objection under § 727(a)(3), the gravamen of which is Randolph's allegation that the Debtor concealed or failed to keep or preserve any recorded information, from which the Debtor's financial condition or business transactions might be ascertained. Because of the

---

**1.** Jennifer was not an asset of the partnership but was owned by the Debtor alone.

Debtor's complete lack of credibility, we find that Randolph has proven the elements of § 727(a)(3) by a preponderance of the evidence.[2] Throughout his testimony, the Debtor attempted to explain that certain records were kept and then destroyed after his being audited by the Internal Revenue Service in 1982, and that other records had been turned over to his attorney. The Debtor's testimony was totally uncorroborated; he offered nothing except his sole testimony scapegoating his former attorney, which was not credited by the Court. Even uncorroborated testimony would suffice to make § 727(a)(3) inapplicable if the factual circumstances were different or if we found the debtor in any way credible, especially in light of the objector's burden to prove its objection. However, neither "if" applies here.

Randolph objects to the Debtor's discharge under § 727(a)(4)(A) on three bases: that the Debtor made false oaths in (1) his original Chapter 13 Statement, (2) his subsequent Chapter 7 Statement, and (3) in his sworn testimony at the First Meeting of Creditors. In order for an objector to sustain his burden of proof, he must establish that there was actual fraudulant intent, which means an actual intent by the debtor to hinder, delay, or defraud his or her creditors. *In re Topper*, 229 F.2d 691, 692 (3d Cir.1956); *Woerner, supra*, 66 B.R. at 971. The false statement must be related to a material matter. *In re Steiker*, 380 F.2d 765 (3d Cir.1967); *Woerner, supra*, 66 B.R. at 972. Matters so trivial in nature as to have but little effect upon the estate and upon creditors have been treated as immaterial. *Id.* However, a discharge may be denied if the omission or false statement adversely affects the creditor's ability to discover other assets or to fully investigate the debtor's pre-bankruptcy dealings and financial condition. *In re Chalik*, 748 F.2d 616, 618 (11th Cir.1984); *Steiker, supra*, 380 F.2d at 768.

In evaluating whether the Debtor knowingly and fraudulently made a false oath in or in connection with this case pursuant to § 727(a)(4)(A), we begin by noting that the applicable standard of proof here is clear and convincing evidence, because this Section turns on the establishment of fraud. *In re Black*, 787 F.2d 503, 506 (10th Cir.1986); *In re Hunter*, 780 F.2d 1577, 1579 (11th Cir.1986); *In re Bogstad*, 779 F.2d 370, 372 (7th Cir.1985); and *Woerner, supra*, 66 B.R. at 972. We find that Randolph failed to produce evidence sufficient to meet the requisite, heavy, clear and convincing evidence standard in support of his contention that discharge should be denied because of false oaths in the Chapter 7 Statement or at the First Meeting of Creditors.

With respect to the alleged false statements contained in the Chapter 7 Statement, the doubtful, but totally unrefuted, testimony was that the Debtor had not reviewed or signed the Chapter 7 Statement of Affairs, Petition, or Schedules, but instead had provided Mr. Wilson with the necessary information and had authorized Mr. Wilson to sign on the Debtor's behalf. Hence, inaccurate or false statements in such documents, which were admitted or proven as such at the trial in the case *sub judice*, cannot "speak for themselves" so as to prove fraudulent intent, at least by clear and convincing evidence.

It is conceivable that the Debtor's sworn affirmation of the truthfulness and accuracy of his Chapter 7 Statement, Petition, and Schedules at the First Meeting of Creditors pursuant to 11 U.S.C. § 341 could have formed the basis of false statements upon which discharge could be denied. *In re Braidis*, 27 B.R. 470, 472 (Bankr.E.D.Pa. 1983). However, in the case *sub judice*, Randolph again failed to meet his stiff burden of proof. The transcript from the First Meeting of Creditors was not offered into evidence, nor was Randolph able to impeach the Debtor, as the Debtor testified, though without particular credible

---

**2.** Ironically, Randolph may not rely heavily on the alleged violation of § 727(a)(3), as no mention is made of it in the Brief submitted by him.

force, that he did not remember his testimony from that occasion. *Cf. Braidis, supra,* 27 B.R. at 472. Although we therefore again emphasize that we have not found the Debtor to be credible, Randolph offers only an argument, and no record, to support his allegation that the Debtor told a different story at the § 341 meeting than he did in testifying at the trial in this matter. Although we observe that the Debtor did not deny the alleged discrepancy, and gave an expressionless reply that he "did not recall" his testimony there, which did little to convince us that either story was other than an expedient fabrication, we find this to be insufficient to meet the burden of clear and convincing evidence.

■ In contrast, we find that Randolph has met his burden of proving that the Debtor made false oaths in his original Chapter 13 Statement by clear and convincing evidence. It is undisputed that in his Chapter 13 Statement, the Debtor made the following responses to the indicated queries:

Q. ...
2. (e) Has debtor or either spouse filing petition operated a business, in partnership or otherwise, during the past 3 years: (If so, give the particulars, indicating names, dates, and places.)
A. Husband [or Debtor] "No" [hereinafter referred to as "Question 2"]

. . . . .

Q. 6. Tax refunds* To what tax refunds (income or other), if any, is either of you, or may either of you be entitled? (give particulars, including information as to any refunds payable jointly to you or any other person. All such refunds should also be listed in Item 13(b)).)
A. "None" [hereinafter referred to as "Question 6"]

. . . . .

Q. 10. Repossessions and returns* Has any property of either of you been returned to, repossessed, or seized by the seller or by any other party, includ-

ing a landlord, during the 90 days immediately preceding the filing of the original petition herein? (If so, give particulars, including the name and address of the party taking the property and its description and value.)
A. "No" [hereinafter referred to as "Question 10"]

. . . . .

Q. 11. (b) Has either of you made any other transfer, absolute or for the purpose of security, or any other disposition, of real or personal property during the year immediately preceding the filing of the original petition herein? (give a description of the property, the date of the transfer or disposition, to whom transferred or how disposed of, and, if the transferee is a relative or insider, the relationship, the consideration, if any, received therefor, and the disposition of such consideration.)
A. "No" [hereinafter referred to as "Question 11"]

. . . . .

Plaintiff's Exhibit 15.

The foregoing statements contradict all of the evidence presented to this Court in this matter and, indeed, were demonstrated to be false by the clear and concise testimony of the Debtor himself.

First of all, it is undisputed that the Debtor had been engaged in the business of horse racing and breeding between 1963 and 1983, and that, from 1981 until 1983, the Debtor had been engaged in a partnership with Randolph. Since the Debtor filed the Chapter 13 Statement on March 1, 1984, the Debtor's response to Question 2 is clearly a false statement.

Secondly, the Debtor testified to filing for a 1983 federal income tax refund of $2,160.79, which would clearly make his response to Question 6 a false statement.

Thirdly, the Debtor alleged the transfer of two horses by the Debtor to "the late Mr. Long" within a month of filing his Chapter 13 Petition and the transfer of the unnamed colt in the same time period. Although we did not find the Debtor's testimony to be credible as to the actual disposi-

tion of these horses, even assuming its accuracy *arguendo,* the Debtor failed to account for these assets in his Statement. Consequently, the responses to both Questions 10 and 11 are false statements.

The only explanation given by the Debtor to blunt the impact of these obviously false statements is some rather confusing testimony which attempts to vaguely place the blame on Mr. Wilson. However, the Debtor's attempt to absolve himself of responsibility fails. Moreover, even if we accepted the Debtor's assertion that his answers were made upon advice of Mr. Wilson and thus were not made "knowingly and fraudulently" with respect to the existence of a partnership, which we do not accept, it does not explain the Debtor's failure to mention his separate racing, training, and breeding business or his home remodelling business. Nor does it explain his lack of interest in amending the Schedules at any time through the present.

In any event, we find that our total inability to believe the Debtor's testimony, which included what we believe to be weak and fanciful tales, is strong support for the requirement of § 727(a)(4) that the Debtor made the false oath "knowingly and fraudulently." We believe that the Debtor continued to utter "false oaths" at trial, the most striking examples of which were the Debtor's attempts to explain the alleged disposition of the horses.

Having determined that false statements were indeed made, the Court must focus on the materiality of those false statements. *Steiker, supra.* We are constrained to hold that discharge must be denied to the Debtor in the case *sub judice* because the false statement with respect to Question 2 is indisputably material, since it has a significant adverse impact upon the ability of any creditors to discover assets or to fully investigate the Debtor's pre-bankruptcy dealings and financial condition. *Chalik, supra.* It is obvious that the failure to reveal the existence or recent existence of a business would prevent creditors from having the opportunity to investigate the Debtor's financial condition. "The veracity of the bankrupt's statements is essential to the successful administration of the Bankruptcy Act." *Id.* at 618. It would seem obvious that nothing could be more material to a bankruptcy case than concealment of a business, since this would prevent creditors from having the opportunity to investigate the Debtor's financial condition and prevent the Trustee from evaluating avoidable transfers.

▮▮▮ Lastly, a discharge will not be denied on the basis of § 727(a)(5). As noted earlier, Randolph presented no evidence as to the value of the horses transferred and, consequently, a "loss of assets" has not been proven. Moreover, there was no other evidence respecting existence of or deficiency of assets which comes within the parameters of § 727(a)(5). Reading this section in conjunction with B.R. 4005, the objector must introduce more than merely an allegation that the Debtor has failed to explain losses, 4 COLLIER, *supra,* ¶ 727.08 at 727-72, e.g., the objector must produce some evidence of the disappearance of substantial assets or of unusual transactions.

▮▮▮ In light of our decision to deny discharge to the Debtor pursuant to §§ 727(a)(3) and (a)(4), it is not necessary to reach the issue of whether the debt owed to Randolph is nondischargeable pursuant to § 523(a)(2) by reason of collateral estoppel, which is the sole basis for argument raised by Randolph on this issue. Although we find this to be a fascinating issue, we observe briefly that the applicability of collateral estoppel can only be made after a careful review of the entire record of the prior case, from which the Court must find that the following four requirements are met in order to bar relitigation of the dischargeability issue: (1) That the issue sought to be precluded is the same as that involved in the prior action; (2) That issue has actually been litigated; (3) That the issue has been determined by a valid and final judgment; and (4) That the determination of the issue was essential to the prior judgment. *In re Ross,* 602 F.2d 604, 608 (3d Cir.1979). Moreover, it is well-established that the party asserting the estoppel has the burden of proving all of these the prerequisites, *In re Smith,* 37

B.R. 996, 999 (Bankr.M.D.Tenn.1984), and we do not believe that proof of the jury's verdict, granting punitive damages, without more, suffices. *See In re Jenkins*, 70 B.R. 408 (Bankr.N.D.Ga.1987). Hence, it is clear to us that Randolph failed to provide the Court with enough from the record from the state court proceeding to determine whether collateral estoppel is applicable. Having relied exclusively on the applicability of collateral estoppel on this issue, Randolph failed to prove his objection to the dischargeability of his debt under § 523(a)(2) by the requisite clear and convincing evidence. *See In re Woods*, 66 B.R. 984, 988 (Bankr.E.D.Pa.1986).

In summary, the case *sub judice* is a testament to the strict burden of proving objections to discharge and dischargeability even when one is faced, as we were here, with a Debtor whose credibility we rate extremely low. The lack of credibility of a Debtor in his statements before this bankruptcy court are ultimately crucial, because we believe that honesty is necessary in a Debtor's dealings with this court if he desires to obtain this benefit of discharge made available to all *honest* debtors. Credibility is relevant to each of the provisions of Section 727. We must observe that it certainly appears possible that the Debtor's acts fell within the parameters of §§ 727(a)(2) and (a)(5) and 523(a)(2), as well as §§ 727(a)(3) and (a)(4). However, Randolph did not meet his strict burden of proof under the former sanctions. Obviously, this is of little comfort to the Debtor here, since a discharge will be denied to him on the grounds of §§ 727(a)(3) and (a)(4).

An appropriate Order will be entered.

### ORDER

AND NOW, this 19th day of May, 1987, in consideration of the Complaint of Luther Randolph (hereinafter referred to as "Randolph") objecting to the discharge of the Debtor and objecting to the dischargeability of Randolph's debt, it is ORDERED that:

1. The previous Order of this Court dated October 1, 1985, Number 67 on the Docket of Bankruptcy Case No. 83–04881K, granting Discharge, is hereby VACATED; and

2. Judgment is entered in favor of the Plaintiff, LUTHER RANDOLPH, and against the Debtor Defendant, LONNIE SOMERVILLE, and pursuant to 11 U.S.C. §§ 547(a)(3) and (a)(4), the Debtor is DENIED a DISCHARGE.